**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, LOCAL 2953, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

No. 81–2384.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 28, 1982.

Decided March 30, 1984.

statements under oath in the FYCA trial to impeach his testimony in another trial.

Mitchell Jay Notis, Washington, D.C., with whom James R. Rosa, Washington, D.C., was on brief, for petitioner.

William E. Persina, Atty. Federal Labor Relations Authority, Washington, D.C., with whom Elizabeth Medaglia, Acting Sol., Federal Labor Relations Authority, Washington, D.C., was on brief, for respondent.

Before WALD and SCALIA, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

MacKINNON, Senior Circuit Judge.

When Congress enacted the National Guard Technician Act of 1968 (Pub.L. No. 90–486 § (2)(1), 82 Stat. 755, 32 U.S.C. § 709 (1976)) it provided that all employed technicians shall be members of the National Guard, hold the military grade specified for that position and be considered in some respects as federal employees. As federal employees, they would have available to them the same retirement and fringe benefits available to other federal employees and be covered by the Federal Tort Claims Act. To confer federal employee benefits and tort claims coverage were the principal reasons for the enactment of the statute and in so providing the Congress made it clear that it recognized that the states' authority in other respects would continue as before. This included generally that reductions-in-force, discharges and other personnel actions would be accomplished by the Adjutant General of the National Guard of the particular state and that a right to appeal from such decisions would *not* extend beyond the state's Adjutant General.

Ten years later, Congress enacted the Civil Service Reform Act of 1978 which, *inter alia*, requires federal agencies to engage in collective bargaining with Union representatives of employees with respect to some personnel matters. This legislation also provided for the creation of the Federal Labor Relations Authority whose jurisdiction, similar to that exercised by the National Labor Relations Board, includes determining whether certain union proposals are proper subjects of mandatory collective bargaining. The government in general and the National Guard in particular cannot be easily analogized to private sector firms dealing with employees. Neither can national guardsmen be easily analogized to other federal employees because, except for federal benefits and tort claims coverage, it was the intent of Congress in the 1968 Technician Act that they be the equivalent of state employees subject to employment, supervision and control by the state adjutants general. It is in this melee that we must determine whether the union proposal, which is the subject of this litigation, is one which the National Guard of Nebraska is required to consider in collective bargaining. The union proposed to eliminate the consideration of a technician's military performance from reduction-in-force actions. The Guard refused to bargain over this proposal and the Federal Labor Relations Authority upheld the Guard's decision. Crucial to our review and analysis are the employment status that only Congress can create by statute, and the statute which brings the subject employment relationship into being. Because the statute involved in this case, the National Guard Technician Act of 1968, is so specific in its mandate, we find that the decision by the agency is consistent with the intent of the statute. We accordingly affirm the decision of the Federal Labor Relations Authority.

## I.

The National Guard Technician Act of 1968 (the "Technician Act")[1] is a special

---

1. The National Guard Act of 1968 provides:

§ 709. Technicians: employment, use, status
 (a) Under regulations prescribed by the Secretary of the Army or the Secretary of the Air Force, as the case may be, and subject to subsection (b) of this section persons may be employed as technicians in—
 (1) the administration and training of the National Guard; and
 (2) the maintenance and repair of supplies issued to the National Guard or the armed forces.
 (b) Except as prescribed by the Secretary concerned, a technician employed under subsection (a) shall, while so employed, be a member of the National Guard and hold the military grade specified by the Secretary concerned for that position.
 (c) The Secretary concerned shall designate the adjutants general referred to in section 314 of this title, to employ and administer the technicians authorized by this section.
 (d) A technician employed under subsection (a) is an employee of the Department of the Army or the Department of the Air Force, as the case may be, and an employee of the United States. However, a position authorized by this section is outside the competitive service if the technician employed therein is

act of Congress enacted for the limited purpose of making fringe and retirement benefits of federal employees and coverage under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–2680 (1976), available to National Guard technician employees of the various states. It accomplishes this by creating a dual status for such technicians. They are to be considered as federal employees for some purposes but are also to be *members* of the respective state National Guard units where they serve. Since technicians are members of the state National Guard, Congress was careful to recognize the authority of the state. Thus, the Secretary of the Army is directed to designate that the state adjutants general "employ and administer the technicians," § 709(c); technicians are required to be

*members* of the National Guard and hold the military grade specified for that position, *id.*, (b), (d); the separation of technicians from their employment for failure to meet military security standards, or for other cause is to be effected by the state adjutant general, *id.* (e)(1), (2), (3); and the adjutant general also is to accomplish a "reduction-in-force, removal, adverse action involving discharge from technician employment, suspension, furlough without pay, or reduction in rank or compensation", *id.*, (4). In addition a right of appeal from any action taken under (1), (2), (3), or (4), *supra*, does "*not extend beyond the adjutant general ...*", *id.*, (5) (emphasis added).

 It thus appears that the scheme of the act is to create the technicians as nomi-

required under subsection (b) to be a member of the National Guard.

(e) Notwithstanding any other provision of law and under regulations prescribed by the Secretary concerned—

(1) a technician who is employed in a position in which National Guard membership is required as a condition of employment and who is separated from the National Guard or ceases to hold the military grade specified for his position by the Secretary concerned shall be promptly separated from his technician employment by the adjutant general of the jurisdiction concerned;

(2) a technician who is employed in a position in which National Guard membership is required as a condition of employment and who fails to meet the military security standards established by the Secretary concerned for a member of a reserve component of the armed force under his jurisdiction may be separated from his employment as a technician and concurrently discharged from the National Guard by the adjutant general of the jurisdiction concerned;

(3) a technician may, at any time, be separated from his technician employment for cause by the adjutant general of the jurisdiction concerned;

(4) a reduction in force, removal, or an adverse action involving discharge from technician employment, suspension, furlough without pay, or reduction in rank or compensation shall be accomplished by the adjutant general of the jurisdiction concerned;

(5) a right of appeal which may exist with respect to clause (1), (2), (3), or (4) shall not extend beyond the adjutant general of the jurisdiction concerned; and

(6) a technician shall be notified in writing of the termination of his employment as a technician and such notification shall be giv-

en at least thirty days prior to the termination date of such employment.

(f) Sections 2108, 3502, 7511, and 7512 of title 5, do not apply to any person employed under this section.

(g)(1) Notwithstanding sections 5544(a) and 6101(a) of title 5 or any other provision of law, the Secretary concerned may, in the case of technicians assigned to perform operational duties at air defense sites—

(A) prescribe the hours of duties;

(B) fix the rates of basic compensation; and

(C) fix the rates of additional compensation;

to reflect unusual tours of duty, irregular additional duty, and work on days that are ordinarily nonworkdays. Additional compensation under this subsection may be fixed on an annual basis and is determined as an appropriate percentage, not in excess of 12 percent, of such part of the rate of basic pay for the position as does not exceed the minimum rate of basic pay for GS–10 of the General Schedule under section 5332 of title 5.

(2) Notwithstanding sections 5544(a) and 6101(a) of title 5 or any other provision of law, the Secretary concerned may, for technicians other than those described in clause (1) of this subsection, prescribe the hours of duty for technicians. Notwithstanding sections 5542 and 5543 of title 5 or any other provision of law, such technicians shall be granted an amount of compensatory time off from their scheduled tour of duty equal to the amount of any time spent by them in irregular or overtime work, and shall not be entitled to compensation for such work...

32 U.S.C. § 709.

nal federal employees for a very limited purpose and to recognize the military authority of the states through their Governors and Adjutants General to employ, command and discharge them. The employment, discipline and discharge of technicians remains completely with the state officials, and their day to day activities on the job are controlled at the state level. In addition, no appeal lies from personnel decisions of the adjutants general. This dual status and the legislative history of the Technician Act is discussed and analyzed further, *infra.*

## II.

### THE FEDERAL SERVICE LABOR-MANAGEMENT RELATIONS STATUTE

The passage of the Civil Service Reform Act of 1978 ushered in a new era of labor-management relations within the federal service. Pub.L. 95–454, 92 Stat. 111, 5 U.S.C. § 7101, *et seq.* (1976). Title VII of the Reform Act established a statutory scheme for collective bargaining between the federal government, as an employer, and labor organizations, as bargaining representatives of federal civilian employees. This title is known as the Federal Service Labor-Management Relations Statute. The Act did not extend to members of the Armed Services. Pursuant to the statute, the Federal Labor Relations Authority ("FLRA" and the "Authority") was created on January 1, 1979, in accordance with § 301 of Reorganization Plan No. 2 of 1978, 3 C.F.R. §§ 323, 327, 329 (1979). The FLRA is charged with administering the statute and with establishing policy relating to labor-management relations within the federal service. 5 U.S.C. § 7105. Among its responsibilities the FLRA is required to determine the appropriateness of units for collective bargaining, conduct rep-

resentation elections, and resolve allegations of unfair labor practices. 5 U.S.C. § 7105(a)(2)(A), (B), and (G). When the parties engaged in collective bargaining are unable to agree their differences are resolved by the Federal Service Impasses Panel, an entity within the FLRA. Final orders of the FLRA are subject to judicial review in an appropriate court of appeals. 5 U.S.C. § 7123(a). Similarly, the Authority may petition the court of appeals for temporary relief and enforcement of its orders. 5 U.S.C. § 7123(b).

Federal employees are provided the opportunity to decide whether or not they wish to be represented by a labor organization through procedures administered by the FLRA. 5 U.S.C. §§ 7102 and 7111. A labor organization securing the majority support of employees within an appropriate bargaining unit is accorded the status of exclusive bargaining representative of the employees in that unit, 5 U.S.C. § 7111(d), and as exclusive representative, is entitled to represent, and negotiate collective bargaining agreements for, employees in its bargaining unit. 5 U.S.C. § 7114.

■ The statute requires the unions and the agency-employers to meet and negotiate in good faith for the purpose of arriving at a collective bargaining agreement. 5 U.S.C. § 7114(a)(4). The duty to bargain on the part of the agency is a broad, though not unlimited one. It extends to most conditions of employment, though certain exceptions are made in recognition of the unique circumstances that surround federal employment. The agency-employer need not bargain over matters relating to political activities, some aspects of position classification, and other subjects specifically exempted by federal statute. 5 U.S.C. § 7103(a)(14).[2] Thus the duty to bargain may not be used as a bootstrap to over-

---

**2.** 5 U.S.C. § 7103(a)(14) provides:
(14) "conditions of employment" means personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions, except that such term does not include policies, practices, and matters—

(A) relating to political activities prohibited under subchapter III of chapter 73 of this title;
(B) relating to the classification of any position; or
(C) *to the extent such matters are specifically provided for by Federal statute ...*
(Emphasis added).

come explicit limitations established by Congress to protect the prerogatives of the federal government as employer. The Act clearly provides that the duty to bargain *does not extend to agency-wide rules for which a "compelling need" exists as determined by FLRA regulations.* 5 U.S.C. § 7117(a)(2).[3] This limit on the duty of an agency to bargain recognizes that within every agency there exists a governmental mission which may not be compromised or negotiated away, in whole or in part, at the bargaining table. In this case it should also be recognized that the personnel here are only nominal federal employees and that the subject bargaining proposal is directed at a facet of the employees' status that is *not* within the federal orbit but is instead completely within those aspects of the Guard's technician status that is completely subject to state authority.

■ Pursuant to the command of its statute,[4] the FLRA has promulgated regulations which establish the standards to be applied in determining whether any agency regulation satisfies the "compelling need" criteria and is thus exempt from the duty to bargain. These standards are set out in 5 C.F.R. § 2424.11:

> A compelling need exists for an agency rule or regulation concerning any condition of employment when the agency

demonstrates that the rule or regulation meets one or more of the following illustrative criteria:

> (a) The rule or regulation is essential, as distinguished from helpful or desirable, to the accomplishment of the mission or the execution of functions of the agency or primary national subdivision in a manner which is consistent with the requirements of an effective and efficient government.
>
> (b) The rule or regulation is necessary to insure the maintenance of basic merit principles.
>
> (c) *The rule or regulation implements a mandate to the agency* or primary national subdivision under law or other outside authority, *which implementation is essentially nondiscretionary in nature.*

(emphasis added).

While the subject regulation, discussed *infra,* may satisfy the requirements of subsections (a) and (b), *supra,* in being essential to the accomplishment of the Guard's mission in a manner consistent with "effective and efficient government," and "necessary to insure the ... basic merit [principle]" in carrying out the State Guard's principal mission, i.e., its *military* mission,[5] the Authority based its decision and order on subsection (c). Hence, we focus on the

---

**3.** 5 U.S.C. § 7117(a)(2) provides:

> (2) The duty to bargain in good faith shall, *to the extent not inconsistent with Federal law or any Government-wide rule or regulation,* extend to matters which are the subject of any agency rule or regulation referred to in paragraph (3) of this subsection *only if the Authority has determined under subsection (b) of this section that no compelling need (as determined under regulations prescribed by the Authority) exists for the rule or regulation.*

(emphasis added). For subsection (b) see n. 4, *infra.*

**4.** 5 U.S.C. § 7117(b)(1) provides:

> (b)(1) In any case of collective bargaining in which an exclusive representative alleges that no compelling need exists for any rule or regulation referred to in subsection (a)(3) of this section which is then in effect and which governs any matter at issue in such collective bargaining, the Authority shall determine under paragraph (2) of this subsection, in ac-

cordance with regulations prescribed by the Authority, whether such a compelling need exists.

**5.** An additional basis for decision also exists: The Labor Management Relations Act provides for the obligation "to engage in collective bargaining with respect to *conditions of employment* ...." But "conditions of employment" is defined by the statute *not* to extend to "such matters [as] are *specifically provided for by federal statute.*" 5 U.S.C. § 7102(2). Thus, when the Technician Act provides: "(4) a *reduction in force* ... shall be accomplished by the *adjutant general* of the jurisdiction concerned", and that "(5) a right of appeal which may exist with respect to clause ... (4) [reduction in force] shall *not* extend beyond the adjutant general of the jurisdiction concerned," (emphasis added) the *specificity* of the federal statute places a "reduction in force" within the discretion of the adjutant general and it is not a "condition[ ] of employment" concerning which he is required to engage in collective bargaining.

third test of "compelling need." The petitioning union argues that the FLRA has inappropriately invoked that standard in relation to a bargaining proposal it put forward in the context of labor negotiations and that raises the basic issue in this case.

### III.

#### THE UNION'S PROPOSAL FOR COLLECTIVE BARGAINING

■ In January and February of 1980, Local 2953 of the American Federation of Government Employees ("AFGE" and the "Union"), and the Adjutant General of the Nebraska National Guard (the "Guard") engaged in negotiations to establish a new collective bargaining agreement. Local 2953 represents the National Guard technicians employed under the Technician Act in the Nebraska unit of the National Guard. National Guard technicians comprise about 8% of the entire personnel of the Guard. Their functions vary, but it is clear from the briefs, relevant statutes and legislative history that their collective role is crucial if the National Guard is to be assured of carrying out its essentially military mission in an "effective and efficient" manner.[6] It is not an overstatement to recognize that technicians who efficiently perform both their military and civilian duties are essential to the Guard. Because of their critical role in the Guard's functioning, technicians are required in almost all cases to serve in the military branch of the Guard for the entire time that they are employed by the Guard for their technical civilian skills. The Congress has stated that it is a "vital necessity [for] technicians [to] maintain [...] a dual status, i.e., both a civilian and military status with their National Guard organization." H.R.Rep. No. 13, 90th Cong., 1st Sess. 10 (1967). To carry out this expressed congressional purpose the

Technician Act provides in 32 U.S.C. § 709(b):

(b) Except as prescribed by the Secretary concerned, a technician employed under subsection (a) shall, while so employed, be a member of the National Guard and hold the military grade specified by the Secretary concerned for that position.

During the negotiations in early 1980, Local 2953 put forward a proposal that had great implications for the dual role of technicians, i.e., nominal federal employees *and* members of the state national guard subject in their military duties to command and control by the state guard. The proposal, labelled "Article 32," contained the Union's demand that in the event of a reduction-in-force ("RIF") affecting the Nebraska National Guard, the technicians would be ranked for the purpose of retention *solely* on the basis of performance evaluations relating to their *civilian roles*. Article 32 reads:

*Proposal*

*Article 32 Reduction-in-force*

Section 32–4 Retention Registers. In the event of a reduction in force, the employer shall establish a retention register which lists employees according to the order in which they will be reached for personnel actions generated by the RIF. The retention register shall be compiled according to the following method:

(a) employees will be ranked according to grade level; and

(b) employees within each grade will be ranked according to *civilian appraisal score*; then

(c) employees having the same appraisal score will be ranked according to length of technician service; then

---

**6.** One indication that Congress intended the Technician Act to promote the *efficiency* of the National Guard is demonstrated by the provision in the Technician Act making the veterans' preference provisions inapplicable to technicians. Congress stated that its purpose in making those provisions inapplicable was that otherwise the National Guard program, *inter alia,*

would be *"less efficient," "efficient* administration of the program [would be] difficult,"* and "the *efficiency* of the [Guard] could well be impaired in terms of the requirement for specified military grades." H.R.Rep. No. 1823, 90th Cong., 2d Sess., July 31, 1968, page 13, U.S.Code Cong. & Admin.News 1968, pp. 3318, 3333 (emphasis added).

(d) employees having the same appraisal score and the same length of technician service will be ranked according to length of creditable service.

Brief for Appellant at 9 (emphasis added). In substance, under the Union's proposal the Guard's retention register would *not* consider military rating. This is no mere procedural tinkering. It is, rather, a substantive proposal that would work a considerable change on the retention rank charts employed by the Guard during RIFs. If, for example, Technician A had received an evaluation score of 90 in the appraisal of his civilian skills, and an evaluation of 10 regarding his military capabilities, for a total of 100, he would be retained in the technician's job over Technician B who received respective evaluation scores of 89 and 90 (total 179) because Technician B was marginally less qualified than A with regard to civilian skills though overwhelmingly more qualified in the military and overall evaluations. The implications of the proposal are therefore overwhelming.

The Adjutant General of the Nebraska National Guard refused to bargain over this proposal and set forth the Guard's position in a letter to the FLRA:

> The union's proposal would require that any reduction-in-force would be effected solely on the technician performance appraisal. The current policy of the National Guard Bureau [of the Department of the Army] (Subchapter 5, paragraph 5-3e, TPM 300, 351) requires that *any reduction-in-force be accomplished utilizing the composite score of the technician and the military appraisal* ... The policy in question implements in an essentially nondiscretionary manner the statutory mandate that technicians maintain military membership in the National Guard and hold the military grade specified for their position (32 U.S.C. § 709(b)). The union's proposal, since its focus is solely on the technician aspect of employment to the *total exclusion of the military* would sanction technicians unqualified to hold the military grade for

those technician positions being retained. This would violate 32 U.S.C. § 709(b).

(JA 15-16) (emphasis added).

The FLRA agreed with the position of the National Guard and its decision and order upheld the Guard's refusal to bargain concerning the Union's proposal, stating:

> In this case ... the Union's proposal would not merely affect the relative weight accorded to a technician's appraisal in relation to his military appraisal but would *preclude management from considering military performance at all in ranking technicians* on the retention register for RIF purposes. Therefore, such proposal conflicts with the mandate of the National Guard Technicians Act of 1968 that both civilian and related military performance be considered as part of a technician's overall evaluation and with the NGB regulation (TPM 351) which implements the statutory mandate in an essentially nondiscretionary manner.

(JA 45) (emphasis added).

TPM 351, which is the chapter governing RIFs, refers to the Technician Personnel Manual promulgated by the National Guard Bureau. The specific provision of TPM 351, Chapter 5-3 which conflicts with the union's proposal, provides:

> e. *Relative retention standing.* The relative retention standing of competing technicians in a competitive level is determined by the descending order of retention standing from the higher group (I) down to the lowest group (III) and within each group from the highest performance rating total to the lowest. When the performance rating totals of two or more technicians are equal, the service computation date will be used to determine their relative standing within the equal totals.
>
> The retention rating is determined by *the combined cumulative totals* of the annual *Technician Performance Rating* NGB Form 2, prepared in accordance with TPP 902 *and the Appraisal By Immediate Military Supervisor* —Reduction In Force, NGB Form 351-2, pre-

pared at the same time and in accordance with the instructions on the NGB Form 351-2 (figure 5-1). Military appraisals will be completed at the time of a RIF only for those technicians who do not have a current military appraisal in their official personnel folders ....

(JA 20) (emphasis added).

The Union has petitioned for review of the FLRA decision and order upholding the refusal of the Nebraska National Guard to bargain concerning the union proposal. In so doing it contends that while *TPM 351* does require that retention registers take account of both civilian and military evaluations of a technician's performance, that nonetheless there exists no "compelling need" for this regulation insofar as it requires the technician's military evaluation to be considered, and thus that the Union's proposal is negotiable under the Act. Specifically the Union argues:

> The FLRA decision is clearly wrong because in making its necessary compelling need determination, the FLRA misconstrued the "mandate" of the National Guard Technicians Act of 1968. Under the FLRA's rules, 5 CFR § 2424.11(c), a "compelling need" determination requires that the FLRA determine the "mandate" of a particular statute, so that it can in turn determine if the regulation for which compelling need allegedly exists "implements" that mandate. In this case, the FLRA's determination of the "mandate" of the National Guard Technicians Act of 1968 was clearly wrong. It was also inconsistent with the FLRA's prior determinations of the mandate of the same act. Additionally, in determining the Act's "mandate", the FLRA found a mandate to exist which is not evident from the plain language of the Act, but offered no rationale for this finding. As this "mandate determination" is crucial to the FLRA's "compelling need" determination; and as the FLRA's "mandate" determination must be overturned, the FLRA's determination

as to "compelling need" must be overturned also.

Petitioner's Brief at 13-14.

■ The FLRA agrees with the Union that the "mandate" of the National Guard Technicians Act of 1968 controls the outcome of this case. Brief for FLRA at 32. The FLRA, however, defends its interpretation of the 1968 statute stating that "the relevant statutory mandate ... requires *both* military and civilian appraisals to be used in civilian personnel actions such as RIFs [and] is thus firmly and directly rooted in the Technicians Act itself." *Id.* at 37. (emphasis added). Because we agree with the FLRA's interpretation of the Technicians Act and with the conclusions the Authority reached as to the "mandate" of that statute, we affirm the FLRA's decision and order. In short, we refuse to construe a military act, that has for its purpose the protection of the security of this nation through its armed forces, as mandating that military performance and rating *not* be considered in relevant personnel actions.

## IV.

### ANALYSIS OF THE TECHNICIAN ACT AND ITS LEGISLATIVE HISTORY

To determine the "mandate" of the National Guard Technicians Act of 1968 requires an analysis of that statute and its legislative history. Originally introduced as Title II of H.R. 2 in the First Session of the 90th Congress in 1967, the Technicians Act was stripped from that bill by a Senate unwilling to rush into an area it felt had not been fully explored.

Subsequently, the intent of Congress in conferring federal employee status on National Guard technicians in the Technicians Act of 1968 was set forth in the House Report accompanying S. 3865, H.R.Rep. No. 1823, 90th Cong., 2d Sess. July 31, 1968, U.S.Code Cong. & Admin.News 1968, p. 3319, as follows:

#### PURPOSE OF LEGISLATION

In authorizing Federal employee status for the National Guard technicians, the purpose of this legislation is—

(a) To provide a retirement and fringe benefit program which will be both uniform and adequate;

(b) *To recognize the military requirements and the State characteristics of the National Guard by providing for certain statutory administrative authority at the State level with respect to the technician programs;*

(c) To clarify the technician's legal status which in certain areas has been the subject of conflicting court decisions, especially on the matter of whether technicians are covered under the Federal Tort Claims Act regarding third party actions against the U.S. Government.

(emphasis added).

■ The principal purpose of enacting the Technician Act was undoubtedly to provide a *retirement and fringe benefit plan for National Guard technicians.*[7] Critics of the old system complained that the failure of the prior law to provide a comprehensive retirement package acted as a drag on the Guard's efforts to recruit and retain a first-rate cadre of technicians. By providing nominal federal employment status to the technicians, the Act sought to cement their allegiance to their Guard careers. As Senator Stennis, then a senior member of the Senate Armed Services Committee, characterized it:

The basic purpose of this bill, Mr. President, is to provide Federal employee status for the technicians thereby establishing for them a uniform and adequate retirement and fringe benefit program and at the same time *provide for statutory administrative authority at the state level for the technician program in recognition of the military requirements and State characteristics of the National Guard.*

114 Cong.Rec. 23,251 (July 25, 1968) (remarks of Sen. Stennis) (emphasis added). The foregoing italicized statement in the

Senate Report and Senator Stennis' remarks make it clear that the mandate of the act embodied *both* the federal employee benefits and the preservation of the "military requirements," which are inseparable from command control by the state adjutants general. And as the statute was bringing essentially state military personnel under some of the retirement and benefit provisions of statutes designed for federal civilian employees, it was necessary to carefully craft the legislation so as not to compromise the essential military requirements of state Guard service. Thus Congress set forth the mandate of the Act in very specific terms with respect to the Union's proposal here in providing in 32 U.S.C. § 709:

(e) *Notwithstanding any other provision of law* and under regulations prescribed by the Secretary concerned—

(1) a technician who is employed in a position in which National Guard membership is required as a condition of employment and who is separated from the National Guard *or ceases to hold the military grade specified for his position* by the Secretary concerned shall be promptly separated from his technician employment *by the adjutant general* of the jurisdiction concerned;

(2) a technician who is employed in a position in which National Guard membership is required as a condition of employment and who fails to meet the military security standards established by the Secretary concerned for a member of a reserve component of the armed force under his jurisdiction may be separated from his employment as a technician and concurrently discharged from the National Guard by the adjutant general of the jurisdiction concerned; . . .

(4) *a reduction in force,* removal, or an adverse action involving discharge from technician employment, suspension, furlough without pay, or reduction in rank or compensation *shall be accom-*

---

7. Coverage by the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–2680, was an additional object.

*plished by the adjutant general of the jurisdiction concerned ...*

32 U.S.C. § 709(e) (emphasis added).

In the Technician Act Congress also described the purpose in employing technicians—significantly the military characteristics of their duties are paramount:

§ 709. Technicians: employment, use, status

(a) Under regulations prescribed by the Secretary of the Army or the Secretary of the Air Force, as the case may be, and subject to subsection (b) of this section persons may be employed as technicians in—

(1) the administration and training of the National Guard; and

(2) the maintenance and repair of supplies issued to the National Guard or the armed forces.

32 U.S.C. § 709(a).

■ Referring to the express language of the Act, the Union argues that "[t]he FLRA's decision relating to the mandate of the National Guard Act is incorrect, and must be overturned, because it is clearly wrong in light of the plain language of the Act, which mentions nothing at all about 'evaluations' or their use." Brief for Appellant at 19. This argument is bootless. The Act need not descend to such detail. The evaluation and rating of personnel are implicit in every military organization, their use is fundamental and need not be explicated. The Union also argues that the mandate of the Act is *limited* to the narrow requirement—"[T]hat technicians maintain the military grade specified for their purpose..." *Id.* at 21. We disagree that the mandate of the Act is restricted to such a narrow focus.

We must accordingly reject the Union's attempt to read the Technician Act as a discrete piece of legislation—a statute that can be read logically as a whole unto itself and have its mandate construed as being limited to one clause only. Such construction is entirely unjustified. The quoted clause is just one component of an elaborate legislative scheme, even as the National Guard is part of the nation's elaborate system of defense, and its mandate must be discerned from the Act as a whole and its legislative history. As the Guard's role cannot properly be understood if separated from the context of our entire national defense, neither can the Technician Act be correctly comprehended by reference to one clause or if the Act is cut loose from the rest of the statutory scheme governing the National Guard. The "compelling need" for TPM 351 is obvious once the fundamental assumptions of the Technician Act are brought to light.

The mission of the National Guard is put forward in a statement of general policy concerning the organization:

In accordance with the traditional *military* policy of the United States, it is essential that the strength and organization of the Army National Guard and the Air National Guard as an *integral part of the first line defenses* of the United States be maintained and assured at all times.

32 U.S.C. § 102 (emphasis added). Because it is a military organization dedicated to a military mission, certain basic assumptions accompany all legislation that deals with the Guard. These assumptions may be explicitly stated in the legislative history of a particular act, or may simply be implicit in the fact that the legislation deals with an organization which has no *raison d'etre* save for the military role it serves. In the congressional debates that led up to the passage of the Technician Act of 1968, many members of Congress explicitly acknowledged that the efforts to enact the law, which appears on its face only to deal with mundane matters of retirement benefits and the like, proceeded from a concern that enactment of the Technician Act was essential to assure that the *military* mission of the Guard would be carried out effectively and efficiently. This intent is evident in the provisions which provide for the continuance of the authority of the state adjutants general to exercise command authority over technicians—*as they do over other guardsmen.* The Third Circuit found that this recognition of state

command authority was a virtual *quid pro quo* for the states' acquiescing in Congress' conferring the limited federal employee status that the Act creates. *New Jersey Air Nat. Guard v. Fed. Labor Rel. Authority*, 677 F.2d 276, 284 (3d Cir.), *cert. denied sub nom.; AFGE v. N.J. Air Nat'l Guard*, 459 U.S. 988, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982).

Almost everyone who spoke on the bill recognized the unique status of the Guard technician and made mention of the Guards military mission. In discussing the Act, Senator Stennis, the sponsor and floor manager of the bill, stated:

> The concept of the technician program is that the technician guardsmen will serve concurrently in three different ways. First, perform his full-time civilian work in the unit; second, perform his *military* training in the unit; *and, third, be available at all times to be called to active Federal service....*
>
> Mr. President, I shall now discuss the statutory controls which the committee felt were essential in order to recognize *the military requirements* and state characteristics of the National Guard. The underlying premise of these controls which would supersede the normal civil service rules and regulations is the fact that the National Guard until it is called into active Federal service is a state organization *subject to the sole command and control of the Governor concerned. It is essential that the technician who constitute only about 8 percent of the total National Guard force be subject to the same rules as the remaining National Guard elements.*

114 Cong.Rec. 23,251 (June 19, 1968) (remarks of Sen. Stennis.) (emphasis added).

The last point, that technicians constituting only eight percent of the Guard should be subject to the *same rules* as the remaining 92 percent, is a definite feature of the act's mandate. Senator Stennis was only one of many in Congress who recognized that the so-called civilian technicians were in reality serving in the military. Senator McIntyre noted that:

> Since the entire technician program serves the *fundamental purpose of providing a constantly ready force capable of responding immediately to meet military requirements*, civilian technicians are required to maintain a *military* position in the Guard, supplemental to their own regular civilian position.

*Id.* at 23,254 (remarks of Sen. McIntyre) (emphasis added). Representative Broyhill added that "the work of the technicians is vital to our entire *military effort*," 113 Cong.Rec. 3,837 (February 20, 1967) (Remarks of Rep. Broyhill) (emphasis added), and Representative Pickle stated that it was *"clear that a purely civilian employee cannot satisfy the need here,* since this technician must also be fully subject to a call-up to active duty with the rest of the unit. Without these people, the units would be crippled, and unable to perform the mission assigned to them." *Id.* at 3,838 (Remarks of Rep. Pickle) (emphasis added).

The House Report on the original bill summarized these views on the importance of the military role of the technicians:

> The Congress, and the Committee on Armed Services, has emphasized the vital necessity of technicians maintaining a *dual status*, i.e., *both civilian and military status* with their National Guard organization. *The Committee's purpose in this desire is to insure that at such time as the unit may be mobilized during a national emergency or a war, the technicians who provide the nucleus for these National Guard organizations will be included among those ordered to active duty.*

H.R.Rep. No. 13, 90th Cong., 1st Sess. 10 (1967) (emphasis added).

All these excerpts from the legislative history show that while the principal purpose of the Technician Act was to provide fringe and retirement benefits to technicians, *the purpose of the technicians was to insure that the military mission of the National Guard* would be carried out effectively and efficiently. This "fundamental purpose," as Senator McIntyre put it, renders easy the search for the Act's

"mandate." *That mandate is to preserve the Guard's military effectiveness and efficiency*, which is accomplished by the Act ensuring the Guard's ability to recruit and retain technicians qualified for *both* their civilian and military roles and preserving the command authority of the state adjutants general in personnel actions in general and reductions-in-force in particular. From this base, it follows quite clearly that since *military* preparedness is the *sine non qua* of the Technician Act, TPM 351 conforms to the mandate of the Act and serves a "compelling need" when it demands that *both military evaluation* and technician efficiency be considered when the Guard formulates retention registers. Any standard that subordinated or eliminated military proficiency in the ratings and evaluations for the RIF process would leave open the possibility that the "best" technicians—in military terms—would be retired during a RIF while the worst would remain. See example at p. 1539, *supra.*

Such result is incompatible with sound defense planning of our military preparedness which must necessarily seek the highest combination of technician ability and military effectiveness. Accordingly, we hold that the primary mandate of the Act is to insure that the military capability of the guard is effective and efficient, and that the Nebraska National Guard was *not* required to engage in collective bargaining negotiations over the union's proposal that *completely eliminated the military rating and evaluations* from the RIF process. A *military* organization which does not pay close and continuing attention to the *military* capabilities of its members hardly deserves the name. The Guard has no obligation to trade on the essential mission of the National Guard at the bargaining table.

The Union attempts to divert attention from the essential military character of the Guard by focusing on the federal employer's general duty to bargain over most of the conditions of federal employment—a duty that became law with the passage of the Civil Service Reform Act of 1978. This basic attempt to have the general act su-

persede the specific statute has been rejected by other courts. *See California National Guard v. Federal Labor Relations Authority*, 697 F.2d 874, 879 (9th Cir.1983) (final authority of state adjutants general over adverse personnel actions cannot be bargained over as "provisions of the Technicians Act constitute a narrow exception to the broad legislative scheme set forth in the Labor-Management Act."); *New Jersey Air National Guard v. Federal Labor Relations Authority, supra*, 677 F.2d at 283 (no duty to negotiate over dismissal procedures as "Congress did not intend any other, more general, legislation, whenever enacted, to qualify the authority of the state adjutants general as set out in the Technician Act.") These holdings and our's today are in keeping with the well established rule that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by the general one, regardless of the priority of enactment. *See, e.g., Bulova Watch Co. v. United States*, 365 U.S. 753, 758 [81 S.Ct. 864, 867, 6 L.Ed.2d 72] (1961); *Rodgers v. United States*, 185 U.S. 83, 87–89 [22 S.Ct. 582, 583–584, 46 L.Ed. 816] (1902)." *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974). *See also, Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1080 n. 3 (D.C.Cir.1981) (MacKinnon, J. concurring) ("Where statutes deal with a subject in both general and detailed terms, and there is conflict between the two, the detailed expression prevails.") Judge Adam's excellent opinion in the *New Jersey* case accurately states that it is

> inconceivable that Congress in 1978, without a moment's thought as to the question of state control over the National Guard, or as to the needs of military discipline over Guard technicians in their dual status as civilian and military personnel, intended to eliminate, by mere implication, the controls that Congress had carefully imposed over those employees and deemed "essential" ten years earlier.

*New Jersey Air National Guard, supra,* 677 F.2d at 285.

It is similarly inconceivable that Congress would have countenanced the removal of military evaluations from Guard retention policies, and would have done so via the backdoor device of an obligation to bargain on the part of federal employers. Overlapping statutes may appear at first glance to create conflicting duties. Such apparent knots are usually undone, as this one is, by close attention to legislative history and quick application of the common sense rule that specific legislation is far more likely to yield the accurate picture of congressional intent than the gleanings left in the trial of some more ambitious and sweeping statutory scheme.

The union also suggests that the requirements of the specific legislation can be reconciled with the general duty to bargain imposed by the Civil Service Reform Act if the court focuses on the Technician Act's command that technicians always hold the military grade necessary to their Guard position. It asserts that under its proposal, the technicians who remain following a RIF will still hold the necessary military grade. Not only does this argument fail to take account of the Technician Act's larger mandate of an efficient and effective military organization, it also leaves us unconvinced of the argument's accuracy in practice. The fact that a technician may, pre-RIF, be serving in one military grade does not mean that he will continue to hold the necessary grade post-RIF. Reductions in manpower may work significant changes in the grade structure of a particular Guard unit. Men may be called upon to step into grades they previously did not hold. Such promotions and reorganizations could not competently be accomplished if the Guard command is forced to wear blinders when the time comes to consult an individual technician's evaluation history. A technician's ability to hold a particular grade post-RIF will be determined and will depend upon his *combined* evaluation. A proposal that would handicap the Guard's ability to reorganize its grade structure following a RIF would conflict with the Technician Act's mandate as we have described it. Thus the union would have us command the Guard to bargain over that very flexibility that is needed to effectively accomplish a RIF. We will not transform one of the Act's many safeguards of efficiency—the grade requirement—into the Act's sole mandate.

## V.

### THE UNION'S ARGUMENT BASED ON THE AUTHORITY'S DECISION IN THE PENNSYLVANIA CASE

The Union raises one argument which deserves further consideration. It asserts that the FLRA has already considered the mandate of the Technician Act, and that in *Association of Civilian Technicians, Pennsylvania State Council and the Adjutant General, Department of Military Affairs, Commonwealth of Pennsylvania,* 3 FLRA No. 8 (1980) (*"Association of Civilian Technicians"* or *"Pennsylvania"*) the "Authority correctly found the mandate of the National Guard Act to be 'that technicians maintain military membership in the National Guard and hold the military grade specified for their technician positions ...'" Brief for Appellants at 18. The Union further asserts that:

> The FLRA did not follow the precedent it set in *Association of Civilian Technicians, [supra]* with regard to the mandate of the National Guard Act. Neither did it overrule or distinguish that precedent. Such failure is a fatal flaw.

Brief for Appellant at 20.

The FLRA responds to this argument by suggesting that the Union has only selectively read from its 1980 Civilian Technician decision which also involved the negotiability of a union proposal related to the preparation of retention registers in RIF situations:

> The Authority [FLRA] in its relevant precedent has recognized the essential equivalency between the military grade requirement in section 709(b), and the requirement of considering both military

and civilian performance in assessing overall technician performance. In its *Pennsylvania [Civilian Technician]* decision ... the Authority stated the mandate of section 709(b) of the Technicians Act in both ways. Thus, the Authority stated in *Pennsylvania* as follows:

In the instant case, however, nothing in paragraph (a) of the Union's proposal would conflict with any part of the NGB [National Guard Bureau] regulation which implements the non-discretionary statutory mandate that technicians must maintain military membership in the National Guard and hold the military grade specified for their technician positions as a condition of continued employment. *That is, while the National Guard Technicians Act of 1968 requires both civilian and related military performance to be considered as part of a technician's overall evaluation,* nothing in the language or legislative history thereof specifies what relative weight must be accorded to each appraisal. (Emphasis added).

Accordingly, the union's assertion ... that the Authority's determination in the present case of the mandate of the Technicians Act is 'contrary to its determination of [the] mandate' in *Pennsylvania* is clearly incorrect. Rather, the Authority has recognized the interchangeability of these two ways of expressing the mandate in its cases dealing with the military grade requirement of section 709(b).

FLRA Brief at 40–41.

The *Pennsylvania* case involved a union bargaining proposal that sought to establish a range of points for each level of a technician's civilian performance. That proposal made no attempt to negotiate the military evaluation requirement out of TPM 351. The decision of the FLRA made clear that the Technician Act "requires both civilian and related military performance to be considered as part of a technician's overall evaluation ..." That ruling is clearly consistent with the FLRA decision in this case. Indeed, if anything ought to be alarming about the FLRA's decision

in *Pennsylvania,* it is the Authority's comment there that "nothing in the language or legislative history thereof specifies what relative weight must be accorded to each appraisal." Though the question is not before the court, it would seem unlikely that a union proposal to give 99% weight to the civilian evaluation and 1% weight to the military evaluation would not also do violence to State command authority and the Act's essential mandate to preserve the Guard's military capabilities. Most people know that all military personnel who hold the same grade do not necessarily perform their military duties with the same proficiency. Whatever the negotiability of such "relative weighting" proposals, the Union's proposal to completely jettison military evaluations from a RIF process involving military personnel clearly conflicts with the express mandate of the Act. Thus a "compelling need" does exist for the regulation that requires a *combination* of both military and technician evaluations to be taken into account in executing a RIF.

### Conclusion

Because the result of this case is obvious following an analysis of the Technician Act and its legislative history, it is not necessary to enter into a prolonged discussion of the appropriate standard of review or deference that this court should employ when objection is made to the FLRA's reading of a statute other than its own. While the court has expressed agreement with the union's position that the FLRA is entitled to no deference when interpreting a statutory provision not within its enabling statute, *U.S. Dept. of Justice v. Federal Labor Relations Authority,* 709 F.2d 724, 729 fn. 21 (D.C.Cir.1983), no deference is required here. The mandate of the Act is clear, the Authority's decision regarding it clearly is correct, and its decision and order is therefore affirmed.

*Judgment accordingly.*