**William OVERTON, Plaintiff–Appellant,**

v.

**NEW YORK STATE DIVISION OF MILITARY AND NAVAL AFFAIRS, a subdivision of the State of New York, James Roche, Secretary of the Air Force, Defendants–Appellees,**

**Victor H. Horton, sued in his individual capacity, Thomas P. Maguire, sued in his individual capacity, Defendants.**

**Docket No. 03–6008.**

United States Court of Appeals, Second Circuit.

Argued: Aug. 5, 2003.

Decided: June 3, 2004.

Stephen Bergstein, Thornton, Bergstein, & Ullrich, LLP (Christopher D. Watkins, of counsel), Chester, NY, for Plaintiff–Appellant.

Ross E. Morrison, Assistant United States Attorney for the Southern District of New York (James B. Comey, United States Attorney, and Neil M. Corwin, Assistant United States Attorney, of counsel), New York, NY, for Defendant–Appellees Roche.

David Axinn, Assistant Solicitor General for the State of New York (Eliot Spitzer, Attorney General of the State of New York, of counsel), New York, N.Y., for Defendant–Appellee New York State Division of Military and Naval Affairs.

Before: POOLER, SACK, and WESLEY, Circuit Judges.

POOLER, Circuit Judge, concurs in the judgment in a separate opinion.

SACK, Circuit Judge.

The plaintiff-appellant, William Overton, was at all relevant times a dual-capacity Guard Technician under the National Guard Technicians Act of 1968, 32 U.S.C. § 709. As such, he was simultaneously employed by the New York Air National Guard (the "Guard") in a military capacity, and by the United States Department of the Air Force (the "USAF") in, at least nominally, a civilian capacity.

Overton brought suit in the United States District Court for the Southern District of New York against the New York State Division of Military and Naval Affairs (which oversees the Guard), the Secretary of the USAF, and two of Overton's Guard Technician superiors, asserting, *inter alia*, that racially harassing and retaliatory actions taken toward him by his immediate superior violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). According to Overton's allegations, the violations occurred while both he and his immediate superior were acting in their civilian capacities.

The district court (Laura Taylor Swain, *Judge*) granted the defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 because Overton's suit " 'challenged conduct [that was]

integrally related to the military's unique structure' " and was therefore nonjusticiable. *Overton v. Roche*, No. 00 Civ. 1808, 2002 WL 31159065, at *3, 2002 U.S. Dist. LEXIS 18170, at *11 (S.D.N.Y. Sept. 26, 2002) (quoting *Luckett v. Bure*, 290 F.3d 493, 499 (2d Cir.2002)).

We affirm.

## BACKGROUND

*The Workplace*

In early 1989, Overton began working for the Guard and the USAF as a dual-status Guard Technician in the Electro–Environmental ("ELEN") shop of the 105th Airlift Wing ("105th AW") at Stewart Air National Guard Base in New York. The mission of the 105th AW is to conduct strategic airlift operations for the USAF, Air National Guard, USAF Reserves, and other Department of Defense components. It operates, maintains, and deploys thirteen C–5A Galaxy aircraft for use in transporting military personnel and military equipment, such as tanks, trucks, armored personnel carriers, helicopters, and artillery.

As a Guard Technician, Overton was both a civilian aircraft electrician employed by the USAF, *see* 32 U.S.C. § 709(e) ("A technician ... is an employee of the Department of the Army or the Department of the Air Force, as the case may be, and an employee of the United States."); *see also Roper v. Dep't of the Army*, 832 F.2d 247, 248 (2d Cir.1987) (noting that "employees ... in military departments" are civilian employees and not enlisted personnel), and a reservist in the Guard, *see* 32

U.S.C. § 709(b) (requiring that a Guard Technician "[b]e a military technician (dual status)," "[b]e a member of the National Guard," and hold a specified "military grade"). In his civilian capacity as an aircraft electrician, Overton was primarily responsible for inspecting and repairing the environmental systems of C–5A aircraft, including their heating, air conditioning, and pneumatic systems. In his military capacity as a member of the Guard, Overton received training in military skills and trained other members of the Guard. He performed his civilian duties mainly during business hours from Monday to Friday and his military duties for one weekend every month and two weeks every summer.

As a civilian employee of the federal government, Overton was entitled to certain medical and retirement benefits. He was a member of a collective bargaining unit, and a collective bargaining agreement governed his civilian employment.[1]

While acting in his civilian capacity as an aircraft electrician, Overton complied with the statutory requirement that he wear his military uniform, including his military rank insignia.[2] The parties disagree as to the extent to which Overton was required to obey military rules of protocol while performing his nine-to-five duties, but Overton concedes that he was subject to some military disciplinary rules, such as regulations preventing him from being absent without leave.

Overton asserts that his civilian chain of command was different from his military chain of command in that each was determined by a separate so-called "manning"

---

1. The collective bargaining agreement provides for the processing of grievances through a chain of command culminating in the state Adjutant General, followed by arbitration if the grievant remains unsatisfied with the result.

2. "[A] person employed [as a Guard Technician] must[,] ... [w]hile performing duties as a military technician (dual status), wear the uniform appropriate for the member's grade and component of the armed forces." 32 U.S.C. § 709(b).

document. The defendants agree that the two chains of command are technically separate—i.e., they are reflected in two separate "manning" documents. It is also undisputed, however, that when Overton's co-worker Master Sergeant Samuel Fletcher became Overton's immediate civilian supervisor in 1991, the two documents established identical chains of command. At that time, Fletcher reported to defendant Lieutenant Colonel Victor Horton, who reported to defendant Wing Commander, Brigadier General Thomas P. Maguire.

### The Alleged Discriminatory Acts

Overton is African–American. He alleges that in 1990, during the course of his civilian employment, Fletcher, who was at that time his civilian co-worker and immediate military superior, created a hostile work environment by making racially offensive remarks and threatening Overton in a racially offensive manner.[3] Overton asserts that he complained about these remarks to his civilian supervisor, Donald Checksfield, who told Overton that Fletch-er had made other offensive racial remarks.

In September 1991, after an internal investigation by Checksfield's supervisor, Checksfield was removed as ELEN shop supervisor for making "a false statement about an individual and report[ing] an incident that never occurred causing an unnecessary racial situation." Letter from Lt. Col. Pasquale A. Stramandinoli to Master Sergeant Donald Checksfield 1 (Sept. 11, 1991). Fletcher was promoted to ELEN shop supervisor to replace Checksfield as Overton's civilian supervisor.[4] From that time forward, Fletcher was both Overton's immediate civilian and immediate military superior. Overton contends that thereafter, Fletcher continued to make racially offensive remarks,[5] and discriminated against Overton with respect to job assignments and support.

In 1995, Overton filed an equal employment opportunity complaint with the Guard and the USAF. He requested a

3. Specifically, Overton contends that Fletcher made comments to him such as, "Smile, so I can see you in the dark," Overton Decl. dated Nov. 12, 2002 ¶ 10, at 3 [hereinafter Overton Decl.], and "Nate [another Guard Technician] likes his coffee [black] like he likes his women," id., and that Fletcher made various "other derogatory 'jokes'" at Overton's expense, id. ¶ 11, at 3. Overton further asserts that when, in Overton's absence, Fletcher was informed of Overton's complaint to his superiors about Fletcher's behavior, Fletcher punched a hole in one of the ELEN shop's walls, shouting, "I'll kill that nigger." Id. ¶ 12.

4. The parties dispute whether a separate external investigation was conducted. According to Overton, Ivan Kelly, the Inspector General of the New York State Division of Military and Naval Affairs, conducted an external investigation, during the course of which he interviewed Overton, Fletcher, and other workers in the ELEN shop. The defendants respond that Ivan Kelly was not the Inspector General of the Division and that his investigation of Fletcher was not authorized.

5. Specifically, Overton asserts that, while acting as his superior, Fletcher made "derogatory comments about African–Americans and other ethnic groups, as well as women," Overton Decl. ¶ 14, at 4; "use[d] the terms 'Spics,' 'Hebes' and 'Kikes' on several occasions," id.; and said, in effect, that "women did not belong working on aircraft, but rather belonged in the kitchen," id. Fletcher also allegedly asked Overton "What's that Bill, your spear?" (referring to a broken broom Overton was holding), id. ¶ 16, at 5, and, in mock dialect, "What you got there [referring to a cheeseburger Overton was carrying], fried chicken?" id. ¶ 17. Overton further states that other co-workers heard Fletcher say, "All blacks are niggers," "Niggers belong on the basketball court rather than working on C5 aircraft," and "[African Americans] are too stupid to be working on aircraft." Id. ¶ 14, at 4.

transfer to another part of the 105th AW or to have Fletcher removed as his supervisor. In December 1996, the Guard and the USAF rejected his complaint. Overton thereupon appealed to the Equal Employment Opportunity Commission. In November 1999, the Commission denied the appeal but issued a "right to sue" letter to Overton.

In June 1996, Overton was transferred from the ELEN shop to another shop, where he received the same salary, did not interact with Fletcher, and found the working environment "tolerable." Deposition of William R. Overton, July 19, 2001, at 266. Nonetheless, on June 4, 1998, Overton resigned from his civilian post and requested a discharge from his military position. He was honorably discharged from the Guard the following day. Overton alleges that his transfer was in retaliation for his discrimination complaints. The defendants assert that it was in response to the needs of the base. Overton contends that, in either case, he resigned because his transfer "curtailed any possibility of future advancement" in the 105th AW. Declaration of William R. Overton dated Nov. 12, 2001 ¶ 22, at 6.

*The Lawsuit*

On March 9, 2000, Overton instituted this lawsuit by filing a complaint in the United States District Court for the Southern District of New York. He alleges that the defendants violated his rights under the New York Human Rights Law, the Equal Protection Clause of the Fourteenth Amendment, and Title VII. On August 10, 2001, following completion of discovery, the defendants moved for summary judgment. Overton conceded at that time that his state-law and federal constitutional claims should be dismissed. *Overton,* 2002 WL 31159065, at *1, 2002 U.S. Dist. LEXIS 18170, at *2–*3. He maintained, however, that during the

course of his performance of civilian duties, Title VII entitled him to protection from a hostile work environment. Specifically, he relied on 42 U.S.C. § 2000e–16, which extends the application of Title VII to civilian employees of military departments, including the USAF.

The district court granted the defendants' motion for summary judgment on Overton's Title VII claim, holding that it was nonjusticiable because the behavior at issue was "integrally related to the military's structure." *Id.,* 2002 WL 31159065, at *3, *4–*5, 2002 U.S. Dist. LEXIS 18170, at *10, *16 (internal quotation marks omitted; quoting *Luckett,* 290 F.3d at 498, in turn quoting *Mier v. Owens,* 57 F.3d 747, 749 (9th Cir.1995), *cert. denied,* 517 U.S. 1103, 116 S.Ct. 1317, 134 L.Ed.2d 470 (1996)). The court observed that Overton's Title VII claim "rest[ed] on allegations of improper, racially-discriminatory conduct by MSgt. Fletcher, who was Plaintiff's immediate military superior," and that Overton's duties as an aircraft electrician were "integrally related to military operations." *Id.,* 2002 WL 31159065, at *4, 2002 U.S. Dist. LEXIS 18170, at *15. The court therefore concluded that any inquiry into Fletcher's actions "would have the same effect on military discipline as a direct inquiry into military judgments.'" *Id.,* 2002 WL 31159065, at *4, 2002 U.S. Dist. LEXIS 18170, at *16 (quoting *Stauber v. Cline,* 837 F.2d 395, 400 (9th Cir.), *cert. denied,* 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 33 (1988)).

Overton appeals.

## DISCUSSION

The *Feres* Doctrine of intra-military immunity bars a lawsuit if "the injuries [for which a plaintiff seeks to recover] arise out of or are in the course of activity incident to [the plaintiff's military] ser-

vice." *Feres v. United States*, 340 U.S. 135, 146, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Title VII creates a limited exception to the *Feres* doctrine that allows some lawsuits to be brought pursuant to the provisions of Title VII if the plaintiff is a civilian employee of the military. *Roper*, 832 F.2d at 248. Overton argues that his claims are justiciable because, although they are covered by the *Feres* doctrine, his lawsuit falls within Title VII's exception for lawsuits by civilian employees of the military. We conclude to the contrary that Overton's claims are barred because, on the facts of this case, Title VII does not override the *Feres* doctrine's prohibition.

### I. Standard of Review

We review a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999), *cert. denied*, 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). A district court must grant a motion for summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Id.*

### II. Intra–Military Immunity

#### A. The Feres Doctrine

■■■■ The Supreme Court first recognized the doctrine of intra-military immunity in *Feres v. United States*, 340 U.S. at 146, 71 S.Ct. 153. There the Court held that uniformed members of the armed forces may not bring suit against the federal government under the Federal Tort Claims Act ("FTCA") for injuries that "arise out of or are in the course of activity incident to service." *Id.* Since *Feres*, the courts have expanded the doctrine [6] so that it now generally protects the government from suit for injuries arising from "activit[ies] incident to [military] service." *United States v. Stanley*, 483 U.S. 669, 681, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987).[7] Most important for our purposes, the *Feres* doctrine prevents members of the military from challenging military decisions through actions brought under Title VII. *Roper*, 832 F.2d at 248.

The Supreme Court has observed that the *Feres* doctrine is designed in large

---

**6.** Although the rule emanating from *Feres* has been extended by the cases that follow it, we refer to the principles that have emerged from these cases as "the *Feres* doctrine."

**7.** The *Feres* doctrine has been extended beyond its original application to FTCA claims. Thus, for example, members of the military cannot challenge military decisions under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), *see Chappell v. Wallace*, 462 U.S. 296, 304, 103 S.Ct. 2362,

76 L.Ed.2d 586 (1983), or under 42 U.S.C. § 1983, *see Dibble v. Fenimore*, 339 F.3d 120, 125 (2d Cir.2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 2068, 158 L.Ed.2d 619 (2004). The doctrine applies not only to legal actions brought by members of the regular military, but also to those brought by members of the National Guard. *See Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 674, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977); *Jones v. N.Y. State Div. of Military & Naval Affairs*, 166 F.3d 45, 51 (2d Cir.1999); *Stauber*, 837 F.2d at 399.

measure to prevent civilian courts from interfering with military discipline and decision-making.

> In the last analysis, *Feres* seems best explained by "the peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty."

*United States v. Muniz*, 374 U.S. 150, 162, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (quoting *United States v. Brown*, 348 U.S. 110, 112, 75 S.Ct. 141, 99 L.Ed. 139 (1954)); *accord United States v. Shearer*, 473 U.S. 52, 57, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985). Such litigation would require civilian courts to evaluate military decisions and disciplinary actions "at the expense of military discipline and effectiveness." *Id.* at 59, 105 S.Ct. 3039. The Court has expressed "concern[ ] with the disruption of '[t]he peculiar and special relationship of the soldier to his superiors' that might result if the soldier were allowed to hale his superiors into court." *Chappell*, 462 U.S. at 304, 103 S.Ct. 2362 (second alteration in original) (quoting *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 676, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977) (Marshall, *J.*, dissenting)).

■ The *Feres* doctrine also acts to prevent federal courts from exercising constitutional powers that are delegated to Congress and the Executive Branch.

> [J]udges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military con-

stitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

*Orloff v. Willoughby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842 (1953); *see also Dibble v. Fenimore*, 339 F.3d 120, 125 (2d Cir.2003) (quoting *Orloff*), *cert. denied,* —— U.S. ——, 124 S.Ct. 2068, 158 L.Ed.2d 619 (2004).

■ Inasmuch as the *Feres* doctrine only bars suit "where the injuries arise out of or are in the course of activity incident to [military] service," *Stanley*, 483 U.S. at 672, 107 S.Ct. 3054 (quoting *Feres*, 340 U.S. at 146, 71 S.Ct. 153) (internal quotation marks omitted), however, it does not exclude all suits by service men and women. If the underlying claim is not incident to military service, members of the armed forces can bring suit, even though, as the Supreme Court has noted, barring such suits might further insulate the military from judicial intrusion. *See id.* at 681, 107 S.Ct. 3054 (observing that, although the Supreme Court has not done so, "one might conceivably disallow [*Bivens* actions] by servicemen entirely"); *see also Lutz v. Sec'y of the Air Force*, 944 F.2d 1477, 1488 (9th Cir.1991) (holding that the *Feres* doctrine did not bar a suit by an officer against military inferiors who broke into her office, stole personal correspondence, and then disseminated it in an effort to damage her reputation, describing these actions as "not 'incident to service'"); *Durant v. Neneman*, 884 F.2d 1350, 1354 (10th Cir.1989) ("When military personnel are engaged in distinctly nonmilitary acts, they are acting, in effect, as civilians and should be subject to civil authority."); *Brown v. United States*, 739 F.2d 362, 369

(8th Cir.1984) (permitting an African–American National Guardsman to pursue a civil claim against fellow soldiers who subjected him to a "mock lynching" at an on-base party).

At the same time, courts have recognized that the "incident to military service" test may bar a claim in federal court even though its pursuit, under the particular circumstances of the case, might not weaken military discipline or interfere with discretion as to military matters. *See Stanley*, 483 U.S. at 682, 107 S.Ct. 3054. The process of determining case-by-case the impact of litigation on the operation of the military would itself unduly intrude into military affairs. *Id.*

> A test for liability that depends on the extent to which particular suits would call into question military discipline and decisionmaking would itself require judicial inquiry into, and hence intrusion upon, military matters. Whether a case implicates those concerns would often be problematic, raising the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands. Even putting aside the risk of erroneous judicial conclusions (which would becloud military decisionmaking), the mere process of arriving at correct conclusions would disrupt the military regime. The "incident to service" test, by contrast, provides a line that is relatively clear and that can be discerned with less extensive inquiry into military matters.

*Id.* at 682–83, 107 S.Ct. 3054.

## B. The Feres Doctrine Applied to Lawsuits by Guard Technicians

The *Feres* doctrine's bar to lawsuits that are "incident to military service" has generally been applied to suits by Guard Technicians arising while they are being paid as civilian employees. Despite the fact that their employment may be denominated civilian, the duties that they are performing are typically military in nature. Although the Supreme Court has not decided whether the *Feres* doctrine applies to a Guard Technician's lawsuit arising from his or her dual-status employment and brought against another Guard Technician, the state, or the federal government, the Circuit Courts of Appeals have: They have nearly unanimously applied the *Feres* doctrine to bar such suits. *See, e.g., Fisher v. Peters*, 249 F.3d 433, 443 (6th Cir.2001) (applying the *Feres* doctrine to a Title VII action brought by a Guard Technician); *Brown v. United States*, 227 F.3d 295, 299 (5th Cir.2000) (same). And they have done so even in cases in which the injuries complained of were incurred while the plaintiff was allegedly performing the nominally civilian aspects of his or her employment. *See, e.g., Wright v. Park*, 5 F.3d 586, 589 (1st Cir.1993) (applying the *Feres* doctrine to a section 1983 action brought by a Guard Technician and allegedly related to his civilian duties); *Stauber*, 837 F.2d at 399 (applying the doctrine to a state tort law claim brought by a Guard Technician and allegedly related to his civilian duties); *NeSmith v. Fulton*, 615 F.2d 196, 201 (5th Cir.1980) (applying the doctrine to a section 1983 claim brought by a Guard Technician and allegedly related to his civilian duties). *But see Mier*, 57 F.3d at 748 (9th Cir.1995) (stating that the *Feres* doctrine bars a Title VII claim by a Guard Technician only if the suit involves "personnel actions integrally related to the military's unique structure").[8]

---

8. The extent to which "redress designed to halt or prevent ... constitutional violation[s] rather than the award of money damages" may be permitted—an issue not presented on this appeal—is discussed in *Dibble*, 339 F.3d at 126 (quoting *Stanley*, 483 U.S. at 683, 107

█ There are at least two persuasive reasons to conclude that the *Feres* doctrine may apply to a lawsuit based on alleged actions taken while the Guard Technician is being paid as a civilian employee.

First, a Guard Technician's employment as a civilian is ordinarily in support of a mission that is ultimately military in nature. The broad purpose of the National Guard Technicians Act of 1968, 32 U.S.C. § 709, which grants Guard Technicians their dual status, is to "insure that the military mission of the National Guard ... be carried out effectively and efficiently." *Am. Fed'n of Gov't Employees v. Fed. Labor Relations Auth.*, 730 F.2d 1534, 1545 (D.C.Cir.1984) (describing the legislative history of the act). "[M]ilitary preparedness is the *sine [qua non ]* of the ... Act." *Id.* at 1546. Congress gave Guard Technicians dual status in order to make these positions more attractive, i.e., "for the limited purpose of making fringe and retirement benefits of federal employees and coverage under the Federal Tort Claims Act ... available to National Guard Technician employees of the various states." *Id.* at 1536–37; *accord Wright*, 5 F.3d at 588.[9] The "military characteristics of [Guard Technicians'] duties are paramount." *Am. Fed'n of Gov't Employees*, 730 F.2d at 1544. As the First Circuit observed, "under the Technician Act's composite regime, technicians are considerably more than nominal members of the military establishment." *Wright*, 5 F.3d at 588.

Thus, the civilian employment of Guard Technicians is often incident to military service. "[A] suit based upon service-related activity necessarily implicates the military judgments and decisions that are inextricably intertwined with the conduct of the military mission.... Civilian employees of the Government also may play an integral role in military activities." *United States v. Johnson*, 481 U.S. 681, 682, 691 & n. 11, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987) (holding nonjusticiable a lawsuit against a civilian agency for allegedly negligent assistance of a military mission); *accord Shearer*, 473 U.S. at 55–56 (holding nonjusticiable a suit brought by the mother of a member of the military who was killed allegedly as a result of the Army's negligence while he was off duty); *Stauber*, 837 F.2d at 400 (relying on *Johnson* with reference to a suit by a Guard Technician).

Second, there are concerns about the intrusive nature of the inquiry that would be necessary for a federal court to disentangle a plaintiff's civilian and military duties if the *Feres* doctrine were applicable only to suits arising out of the latter. "[T]he mere process of arriving at correct conclusions would disrupt the military regime." *Stanley*, 483 U.S. at 683, 107 S.Ct. 3054; *see also Lutz*, 944 F.2d at 1487 ("[W]here it is sufficiently ambiguous whether challenged actions were 'incident to military service,' and the process of disentangling conduct not incident to service from that incident to service would itself work an impermissible intrusion upon military matters, *Feres* must be applied to the whole course of conduct.").

In a decision with a setting strikingly similar to the present one, *Stauber v.*

S.Ct. 3054; internal quotation marks omitted; omission and alteration in original).

9. One of Congress's explicit goals in giving Guard Technicians dual status under the Guard Technicians Act was to grant them coverage under the Federal Tort Claims Act.

*Am. Fed'n of Gov't Employees*, 730 F.2d at 1542 (citing H.R.Rep. No. 90–1823, U.S. Code Cong. & Admin.News 1968, p. 3318 (1968)). We have found no evidence that a similar explicit goal of the Act was to grant Guard Technicians rights under Title VII.

*Cline,* 837 F.2d 395 (9th Cir.1988), the Ninth Circuit observed that "the [harassing] conduct that occurred at the maintenance shop cannot give rise to actionable tort claims without impinging on military authority and calling into question matters which are exclusively the subject of military remedies." *Id.* at 399. The court continued, "[The plaintiff] and the defendants were always under the direct command of active-duty military officers. The parties shared the same direct military relationships whether on civilian or military status. Their conduct was subject to military discipline, and indeed, plaintiff requested that his superiors step in to improve the situation." *Id.* at 400. "In this circumstance, an inquiry into the civilian activities would have the same effect on military discipline as a direct inquiry into military judgments." *Id.* (quoting *Johnson,* 481 U.S. at 691 & n. 11, 107 S.Ct. 2063; internal quotation marks omitted). The court concluded that the *Feres* doctrine was applicable.

Overton has not argued that his claims are not "incident to military service," as he might have. That issue is therefore not before us. *See Chayoon v. Chao,* 355 F.3d 141, 143 (2d Cir.2004) (" 'On a motion invoking sovereign immunity to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists.' " (quoting *Garcia v. Akwesasne Hous. Auth.,* 268 F.3d 76, 84 (2d Cir.2001))); *Wake v. United States,* 89 F.3d 53, 57 (2d Cir.1996) (holding that "the *Feres* doctrine concerns the waiver of sovereign immunity"). We therefore need not address the question whether the *Feres* doctrine applies because Overton's claims "arise out of or . . . in the course of activi-

ty incident to [military] service." *Feres,* 340 U.S. at 146, 71 S.Ct. 153; *cf. Brown,* 739 F.2d at 368 (holding that *Feres* did not bar claims against national guardsmen who participated in a "mock lynching").[10]

### III. Title VII's Exception to the *Feres* Doctrine

■ Although Overton does not contest that the injuries for which he seeks redress arose from activities "incident to military service," the application of the *Feres* doctrine to Title VII actions such as the one before us is not entirely straightforward. "[*Feres* ] is a judicial doctrine leaving matters incident to service to the military" but only "in the absence of congressional direction to the contrary." *Stauber,* 837 F.2d at 399; *accord Chappell,* 462 U.S. at 304, 103 S.Ct. 2362 (noting that Congress is "the constitutionally authorized source of authority over the military system of justice" and can create causes of action that supersede the *Feres* doctrine); *Roper,* 832 F.2d at 248 (holding that the "express indication" of Congress supersedes the *Feres* doctrine); *Gonzalez v. Dep't of Army,* 718 F.2d 926, 928 (9th Cir.1983) (same). Title VII is, of course, "congressional direction." The issue thus becomes whether and in what circumstances Title VII allows a Guard Technician to bring a claim relating to his or her civilian employment despite the *Feres* doctrine and whether Overton's suit is, therefore, justiciable.

### A. Section 2000e–16

■ The provision of Title VII under which Overton brings suit, 42 U.S.C. § 2000e–16, reads in pertinent part:

---

**10.** The concurrence warns of the "undisciplined expansion of the *Feres* doctrine." (*Infra,* p. 100.) Inasmuch as the general application of *Feres* to Guard Technicians is well settled, and its application to the plaintiff in this case is effectively conceded, we doubt that this opinion warrants that alarm.

(a) Discriminatory practices prohibited
. . . .

All personnel actions affecting employees or applicants for employment . . . in military departments as defined in section 102 of Title 5, [which includes the Department of the Air Force,] . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin.

These protections apply only to civilian employees of the military. *Roper*, 832 F.2d at 248. Overton observes that even though at all relevant times he was a military employee of the Guard, he was performing the duties for which he was paid as a civilian at the times he allegedly was injured. He therefore insists that he is entitled to proceed under section 2000e–16 with respect to those injuries.

As far as we have been able to determine, each Circuit to address this issue has held on the facts before it that a section 2000e–16 action brought by a Guard Technician could not proceed in the face of the *Feres* doctrine. The Circuits have differed, though, in their analysis.

The Sixth Circuit has held that section 2000e–16 never supersedes the *Feres* doctrine in an action by a Guard Technician, even if the alleged harassment arises in the course of his or her civilian employment. *Fisher*, 249 F.3d at 443–44. The court based its decision on its previously articulated view "that the positions of National Guard technicians are 'irreducibly military in nature.'" *Id.* at 439 (quoting *Leistiko v. Stone*, 134 F.3d 817, 820–21 (6th Cir.1998)) (per curiam) (in turn quot-

ing *Leistiko v. Sec'y of the Army*, 922 F.Supp. 66, 73 (N.D.Ohio 1996)));[11] *cf. Wright*, 5 F.3d at 588 (stating that the role of a Guard Technician is "irreducibly military in nature"). Similarly, the Ninth Circuit has stated that § 2000e–16 does not create an exception to the *Feres* doctrine for suits by Guard Technicians because the "applicability of Title VII [to such suits] is clearly not provided in 'unmistakable terms.'" *Mier*, 57 F.3d at 749 (quoting *Gonzalez*, 718 F.2d at 928 (stating that "if Congress had intended for [§ 2000e–16] to apply to the uniformed personnel of the various armed services it would have said so in unmistakable terms")).[12]

The Fifth Circuit, by contrast, has read section 2000e–16 explicitly, but partially, to override the *Feres* doctrine. *Brown*, 227 F.3d at 299. "As a consequence of the limited scope of the Title VII waiver, employment discrimination claims by [Guard Technicians] must be categorized as either arising from their position as a civilian employee of a military department, or their position as a uniformed service member." *Id.* In the Fifth Circuit's view, a Guard Technician's Title VII claim is therefore permissible if it involves only actions taken purely in the civilian capacities of the persons involved. The court noted that in some cases, categorizing a Guard Technician's claim may be difficult. Indeed, an apparently civilian claim might be military if the challenged conduct was "integrally related to the military's unique structure." *Id.* at 299 n. 5 (citing *Mier*, 57 F.3d at 750). It was clear on the facts before the *Brown* court that the actions it

---

**11.** The court noted, alternatively, that the particular claim that the plaintiff made with respect to her failure to be promoted was "military and thus [in any event] non-justiciable." *Fisher*, 249 F.3d at 443.

**12.** The *Mier* court nevertheless concluded that some Title VII claims brought by Guard Tech-

nicians are justiciable because the *Feres* doctrine applies to such claims only if "the challenged conduct is integrally related to the military's unique structure." *Mier*, 57 F.3d at 750.

was considering were military. The court therefore was not required to decide in what cases behavior towards a Guard Technician might be purely civilian, not "integrally related to the military's unique structure," and thus, under its analysis, the basis for a justiciable Title VII claim.

 We addressed the tension between the *Feres* doctrine and section 2000e–16 in *Luckett v. Bure*, 290 F.3d at 499. There, the plaintiff, an Army reservist and Guard Technician proceeding *pro se*, received a military transfer as a result of his physical condition. The transfer rendered him unqualified for his civilian Guard Technician post. In analyzing the effect of *Feres* on the justiciability of his subsequent Title VII claim, we, like the Fifth Circuit, abjured a categorical rule barring suit such as that adopted by the Sixth Circuit in *Fisher*. Instead, we applied two tests: Section 2000e–16 does not supersede the *Feres* doctrine and thus does not permit a Guard Technician to pursue a Title VII claim if the claim (1) challenges conduct "integrally related to the military's unique structure," *id.* at 498 (quoting *Mier*, 57 F.3d at 749; internal quotation marks omitted),[13] or (2) is not "purely civilian," *id.* at 499 n. 3 (internal quotation marks omitted). Under both of

these tests, we concluded that the *Feres* doctrine barred the plaintiff's section 2000e–16 action. *Id.* at 499.

We again apply the two tests described in *Luckett* to determine whether Overton's claim falls within Title VII's exception to the *Feres* doctrine.[14]

### B. Overton's Claim

 Overton asserts that his Title VII claim is different from those asserted by the plaintiffs in *Luckett, Brown, Fisher*, and *Mier*. In all of those cases, the plaintiffs challenged decisions regarding their military status in the National Guard. Because a military decision was at the core of each case, it was ultimately easy to conclude that whatever the test, section 2000e–16 did not override the operation of the *Feres* doctrine. But Overton's claim focuses on Fletcher's behavior toward Overton on weekdays during business hours, when both were performing what Overton asserts were purely civilian duties not integrally related to the military's unique structure. We disagree with Overton's characterization and therefore conclude that in the factual circumstances of this case, section 2000e–16 does not overcome the *Feres* bar.

---

**13.** We recast the Ninth Circuit's *Mier* decision, under which the *Feres* doctrine applies to suits by Guard Technicians only when they challenge conduct "integrally related to the military's unique structure," *Mier*, 57 F.3d at 750, as a test for determining whether a Title VII suit by a Guard Technician is exempt from the *Feres* doctrine. The *Brown* court treated the *Mier* test similarly, indicating that in the course of determining whether section 2000e–16 permits a Title VII action to proceed despite the *Feres* doctrine, if determining whether "a claim is [purely civilian were] difficult," a court might "have to rely on factors such as whether the conduct is 'integrally related to the military's unique structure.' " *Brown*, 227 F.3d at 299 n. 5 (quoting *Mier*, 57 F.3d at 750).

**14.** Because we conclude that Overton's claim fails both of the tests adverted to in *Luckett*, we need not and do not decide whether the two tests are equivalent, as we suggested in dicta in *Luckett*, 290 F.3d at 499. We cannot foreclose the possibility that a case may arise that is not "purely civilian" and therefore fails one of the tests, but the challenged conduct is not "integrally related to the military's unique structure," and the suit therefore passes the other test. In any event, we note that the ultimate question is always whether section 2000e–16(a) constitutes a command for us to override the *Feres* doctrine in the case at hand.

To be sure, at the time the conduct of which Overton complains took place, his status was "civilian." He was then being paid by the USAF to perform the nominally civilian portion of his Guard–Technician duties. At the same time, however, Overton's suit, if permitted to proceed, would likely affect his military relationship with Fletcher. The defendants' alleged misconduct occurred while Overton worked on a military base to assure the military's airlift capacity, while wearing a military uniform, under the direct supervision of Fletcher, who was also his immediate military superior. Overton's closely related dual roles engendered closely related military and civilian relationships with Fletcher. The nominally civilian, yet distinctly military, relationship between the two was thus central to Overton's military mission and the military's unique structure of command. Any attempt surgically to dissect and analyze the civilian relationship between Overton and Fletcher, with its military dimensions, moreover, would itself threaten to intrude into their military relationship.[15] Courts are "ill-equipped to determine the impact upon discipline that ... [such an] intrusion upon military authority might have."[16] *Chappell*, 462 U.S. at 305, 103 S.Ct. 2362.

Because Overton's suit would likely intrude into and have an impact upon his military relationship with Fletcher, we conclude that Overton challenges conduct "integrally related to the military's unique structure," and that the relationships and behavior that are the subject of his suit were not "purely civilian." Overton therefore cannot pursue his Title VII claim in federal court. At the end of the day, we find nothing in the text or history of section 2000e–16(a) or its judicial interpretation to convince us that it constitutes a clear statutory command not to apply the *Feres* doctrine to Overton's claims. *See Roper*, 832 F.2d at 248 (noting that "[i]n the absence of some express indication in the legislative history that Congress intended Title VII to apply," the *Feres* doctrine bars suits that affect "military hierarchy and command").

We see no reason and the government does not seek to persuade us,[17] however, that there can be no situation in which a Guard Technician would have a justiciable Title VII claim with respect to his or her "purely civilian" employment by the federal government, even in circumstances where the *Feres* doctrine is otherwise applicable. We need not and do not speculate as to what circumstances, if any, might give rise to such a claim.

## CONCLUSION

The actions of Fletcher toward Overton to which Overton has testified, and the

---

15. An instruction to the district court to make such a distinction without intruding into the military relationship might well be akin to Portia's injunction to Shylock to take a pound of flesh without spilling a drop of blood. *See* William Shakespeare, *The Merchant of Venice*, Act IV, Sc. 1.

16. In addition, Overton's suit implicates his military relationships with defendants Horton and Maguire, who were *also* Overton's military and civilian superiors.

17. In its supplemental letter brief dated September 4, 2003, the government asserts that

"[i]f this Court affirms the district court's judgment, a Guard[ ]Technician may still assert claims arising under Title VII, where those claims arise 'purely from the [Guard Technician's] civilian employment' and are not 'integrally related to the military's unique structure,' " and that "under *Luckett*, a Guard[ ]Technician may maintain a Title VII claim, provided that the claim does not concern the Guard Technician's supervision by his military supervisor while performing military duties," Government's Letter Br. dated Sept. 4, 2003, at 4 (second alteration in origi-

National Guard's and USAF's asserted failure effectively to address them—which we must accept as fact for purposes of reviewing the district court's grant of the defendants' motion for summary judgment—are plainly reprehensible. Nonetheless, the *Feres* doctrine applies, the exception of 42 U.S.C. § 2000e–16 is unavailable, and Overton's claims must therefore be resolved under military law and procedures or pursuant to the collective bargaining agreement that governs Overton's civilian employment, not by federal courts applying federal statutory law in a civil suit. We therefore affirm the judgment of the district court.

POOLER, Circuit Judge, concurring in the judgment.

I concur in the judgment. Regretfully and respectfully, I cannot concur in the majority's reasoning, as set forth in Section III of the opinion, because I find that its analysis contains two central flaws. First, the rationale underlying the majority's holding reflects a fundamental misunderstanding of this court's holding in *Luckett v. Bure*, 290 F.3d 493 (2d Cir. 2002), and worse, it undermines what little civil rights protections were previously afforded civilian technicians employed in a dual capacity with the military. The majority concludes that Overton's claims are integrally related to military matters, notwithstanding the fact that Overton alleged that the racial discrimination occurred during the week day working hours "while both he and his immediate superior were

acting in their civilian capacities." Op. at 85, 95–96 [1]

The majority cites to the following facts as support for its conclusion: (1) Overton worked as an aircraft electrician on a military base; (2) he was responsible for aircraft maintenance duties; (3) he wore a military uniform while working; and (4) he was supervised by an individual who happened to be both his military and civilian supervisor. Op. at 95–96 Based solely on these facts, the opinion summarily concludes that the court cannot "see [ ] how [it] or ₎a district court could separate the strands of Overton's *relationship* with Fletcher to identify something about them that involved 'purely' civilian employment." Op. at 96 (emphasis added). This cursory analysis misses the mark. The conduct complained about by Overton consists of various personnel decisions, which include promotion, assignment and transfer decisions. Overton also complains about numerous racially offensive comments and acts committed by Fletcher against Overton or in Overton's presence. I believe the majority, however, incorrectly focuses on the nature of Overton's employment relationship rather than the conduct about which Overton complains. *Luckett*, however, very clearly requires this court to consider the latter:

> Title VII protections extend to discrimination actions brought by military personnel in hybrid jobs entailing both civilian and military aspects except when the ***challenged conduct*** is integrally related to the military's unique structure.

nal and quoting *Luckett*, 290 F.3d at 499; internal quotation marks omitted).

1. Significantly, the opinion maintains that "Overton has not argued that his claims are not 'incident to military service,' and, therefore, that issue is not before us." Op. at 93 This position contradicts an earlier statement in the opinion that "[a]ccording to Overton's allegations, the violations occurred while both he and his immediate superior were acting in

their civilian capacities." Op. at 85 Similarly, the opinion acknowledges that Overton characterizes, albeit wrongly, that his claims involved "purely civilian duties not integrally related to the military's unique structure." Op. at 95–96 Accordingly, the opinion appears to be internally inconsistent as to whether Overton alleged, as an initial matter, that his claims were not incident to military service.

*Luckett,* 290 F.3d at 499 (emphasis added). What this language suggests is that the general military nature of the complainant's employment is not the central concern. It is indeed irrelevant that Overton or Fletcher were wearing uniforms or worked on a military base when Fletcher made the challenged comments. Instead, the issue is whether the challenged conduct itself, rather than the nature of the employment relationship, is military in nature.

Indeed, courts from other circuits in similar cases have likewise focused on whether the complained of actions implicate military concerns. *See, e.g., Brown v. United States,* 227 F.3d 295, 299 (5th Cir. 2000) (the plaintiff air-technician "seeks review of *actions* taken by the military that form the basis of his military discharge. While these actions had a civilian component ... they nonetheless were actions taken within the military sphere.") (emphasis added); *Gregory v. Widnall,* 153 F.3d 1071, 1074 (9th Cir.1998) ("Title VII applies to Guard technicians except when they challenge personnel *actions* integrally related to the military's unique structure.") (citing *Mier v. Owens,* 57 F.3d 747, 748 (9th Cir.1995) (emphasis added and internal quotation omitted)). These cases, like *Luckett,* correctly focus on the challenged conduct, rather than on the nature of the employment relationship. In holding otherwise, the majority today makes it nearly impossible for a civilian technician, alleging a Title VII claim, to surmount the *Feres* doctrine. Obviously, a civilian technician's employment with the military will necessarily create a military employment relationship and involve duties with some military aspects.

The majority is concerned that it cannot "surgically" dissect and analyze the civilian versus military relationship between Overton's and Fletcher's relationship. Op. at 96 However, we need not do so to resolve this case. To the contrary, looking at the relationship status of the personnel members is the approach of the Sixth Circuit, an approach we rejected in *Luckett. See Fisher v. Peters,* 249 F.3d 433, 443–44 (6th Cir.2001). The Sixth Circuit has held that *Feres* categorically bars claims by guard technicians because their positions are "irreducibly military in nature." *Id.* In *Luckett,* we opted instead for an inquiry into whether the Title VII claim "challenges conduct integrally related to the military's unique structure." By choosing a conduct-based rather than status-based inquiry, this court held that, notwithstanding the military aspect of the guard technician position, their Title VII claims can be considered unless they complain about some activity or conduct integrally related to military matters.

Although the majority places much emphasis on the dual nature of Overton's employment, and suggests that his employment with the USAF was only "nominally civilian," Op. at 96, it is without dispute that Overton was employed in two distinct capacities: he was employed in a military capacity by the New York Air National Guard to perform military training services, and he was employed by the USAF in a civilian capacity to inspect and repair aircrafts. Op. at 85. Moreover, the performance of the two jobs was not simultaneous. Overton performed his civilian employment during the work week and he performed his military duties for one weekend every month and two weeks every summer. Thus, aside from the unfortunate circumstance that Overton's supervisor for both his military and civilian jobs was the same, there seems to be little support for the majority's conclusion that Overton's employment (by two separate and distinct entities) engendered "closely related dual roles." Op. at 96.

In the end, however, I reluctantly find that Overton's Title VII claims should be dismissed insofar as his claims relate to military personnel decisions, which specifically include (1) Fletcher's promotion and assignment to ELEN shop supervisor, (2) defendants' failure to remove Fletcher from his position after Overton complained of Fletcher's conduct; (3) Overton's reassignment to the Aerospace Ground Equipment shop in June 1996; and (4) Overton's complaint that Fletcher assigned him to perform less desirable tasks than non-African-American technicians working in the same shop. These claims relate to conduct that is integrally related to specific military matters because they involve personnel decisions surrounding the staffing needs of a particular shop, the quality of workplace supervision, and the imposition of disciplinary measures. Moreover, an analysis into whether Fletcher assigned Overton to perform less desirable tasks would involve some inquiry into Overton's and other shop employees' job responsibilities for inspecting and maintaining various aircrafts. Accordingly, I concur with the judgment, insofar as it dismisses claims based on these personnel decisions.

My second difficulty with the majority's reasoning is that it fails to address Overton's hostile work environment claims, which is due, in part, to its conclusion that Overton's claims are categorically barred due to the status and nature of his employment. These claims should not have been deemed nonjusticiable under *Feres* because they involve conduct not integrally related to any military function. Overton complains about numerous acts and comments by Fletcher while both men were employed in their civilian capacity and performing civilian classed duties. As discussed above, the test set forth by *Luckett* makes clear that the primary issue is whether the challenged conduct itself, rather than the nature of the employment

relationship, is military in nature. While the decision whether to transfer Overton or to discipline Fletcher may not be examined because these decisions implicate the military's unique structure of command and discipline, these acts and comments by Fletcher cannot be said to relate to any military function.

However, Overton's hostile work environment claims cannot survive because he does not allege conduct that is sufficiently egregious. To prevail against a motion for summary judgment on a hostile work environment claim, "a plaintiff must show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Terry v. Ashcroft*, 336 F.3d 128, 147 (2d Cir.2003) (quotation marks and citations omitted). In this case, Overton claims that in or about 1990, Fletcher said to him, "Smile, so that we can see you in the dark." On another occasion, Fletcher told him that his co-worker "likes his coffee [black] like he likes his women." In Fall 1991, Fletcher was angry with Overton as a result of Overton's complaints regarding Fletcher's conduct. Outside of Overton's presence, Fletcher stated "I'll kill that nigger." In or about 1994 or 1995, when Overton was carrying a broom handle, Fletcher said, "What's that Bill, your spear?" In 1995, Fletcher allegedly threw a salt shaker at Overton. In that same year, Overton claimed that Fletcher marked him AWOL when he was approximately 15 minutes late to work, even though Fletcher had not done this when other employees were late.

When considered in total, these "[i]solated incidents or episodic conduct [cannot] support a hostile work environment claim." *Richardson v. New York State Dept. of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999). Further, these handful of incidents, which ranged over a period of several

years, was insufficient to raise a triable issue of constructive discharge, as no reasonable jury could conclude that the Fletcher deliberately created working conditions that were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Terry,* 336 F.3d at 152 (citations omitted). Accordingly, to the extent that Overton raised a hostile work environment and constructive discharge claim, these claims should have been dismissed for this reason, and not because they were barred by *Feres.*

As a final point, I wish to make clear that although I ultimately agree with the majority's disposition of Overton's claims, I write separately to warn against an undisciplined expansion of the *Feres* doctrine. It is important to recognize "that not every action by one member of the armed services against another implicates military decision making, relates to the military mission, or is incident to service." *Lutz v. Sec. of the Air Force,* 944 F.2d 1477, 1484 (9th Cir.1991); *see also Mier,* 57 F.3d at 750 ("[military] personnel actions are not always integrally related to the military's unique structure."). This observation is especially relevant in light of the fact that the military has and continues to expand in number and in function. *See* Jonathan Turley, *Pax Militaris: The Feres Doctrine and the Retention of Sovereign Immunity in the Military System of Governance,* 71 GEO. WASH. L. REV. 1, 34 (2003). As noted by Professor Turley, the military has now "taken on a variety of 'collateral functions' far removed from core combat-related functions. Many of these collateral functions were once handled by civilian companies and, depending on availability, civilian companies are often used as an alternative resource.... The application of *Feres* in collateral areas of military governance produces the most vivid examples of doctrinal over-reach." *Id.* at 34–35. In

light of this shift in the military's general function, and in order to protect the rights of the substantial population of civilian technicians employed by the military, the historically liberal and automatic invocation of "*Feres* concatenations must come to an end." *Lutz,* 944 F.2d at 1487 (quotation and citation omitted).